**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NIAGEN BIOSCIENCE INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. FOOD AND DRUG ADMINISTRATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-00309 (AHA) |

**Memorandum Opinion and Order**

Niagen Bioscience Inc. sues federal agencies and officials, challenging the Food and Drug Administration's interpretation of "dietary supplement" to include nicotinamide mononucleotide, an ingredient in anti-aging products. The government moves to dismiss, arguing that Niagen lacks Article III and prudential standing to challenge that interpretation. The court disagrees and denies the motion.

## I. Background

Niagen's complaint asserts that the Food and Drug Administration ("FDA") acted contrary to law, and arbitrarily and capriciously, by classifying an ingredient—nicotinamide mononucleotide ("NMN")—as a "dietary supplement" instead of as a "drug" under the Dietary Supplement Health and Education Act of 1994. 21 U.S.C. § 321(ff). That distinction matters because a company marketing a "drug" has to go through a strict and often long regulatory process, usually involving clinical trials to get FDA approval. *See id.* § 355. Meanwhile, a company marketing a "dietary supplement" goes through a more relaxed regulatory regime: It generally submits a notice called a "new dietary ingredient notification" to the FDA that explains why the

product can "reasonably be expected to be safe" and, after waiting seventy-five days, it can market and sell the product as a dietary supplement without further approval. *Id.* § 350b(a)(2), (c)(1).

Niagen's suit claims that the FDA has to regulate NMN as a "drug." On Niagen's reading of the statute, NMN meets the general definition of "dietary supplement," *see id.* § 321(ff)(1)–(2), but is excepted from that definition under a provision that applies when an ingredient is being investigated as a potential new drug and has not been "marketed as a dietary supplement or as a food" before being authorized for investigation as a new drug, *id.* § 321(ff)(3)(B). According to the complaint, the FDA disagrees on the last part: It agrees that NMN meets the general definition of "dietary supplement," *id.* § 321(ff)(1)–(2), but says the exception does not apply because NMN was "marketed as a dietary supplement" before being authorized for investigation as a new drug, *id.* § 321(ff)(3)(B). That difference in interpretation centers on what it means to have previously marketed something as a dietary supplement. Niagen says that language means the ingredient was previously marketed after going through the FDA's notice regime, including sending a "new dietary ingredient notification," which it says never happened for NMN. *Id.* § 350b(c)(1); *see id.* § 350b(a)(2). It also says the FDA used to adopt Niagen's interpretation, and arbitrarily changed its position here without adequate explanation. *See* ECF No. 1 ¶ 106 (alleging that "[f]or over a decade, FDA insisted that NMN was excluded from the dietary-supplement definition and that qualifying 'marketing' meant prior lawful U.S. marketing"); *id.* ¶¶ 1–2, 86 (alleging the FDA reversed its position in September 2025); *see also id.* ¶¶ 61, 88–91.

Niagen sues because it makes products meant to encourage the body's production of a compound called nicotinamide adenine dinucleotide ("NAD+"), which plays a role in cellular function and has potential anti-aging and cognitive benefits. *Id.* ¶ 50. Niagen's products contain an ingredient called nicotinamide riboside, which is a molecular building block for NAD+. *Id.*

¶ 14. But there are also other building blocks the body can use to produce NAD+, including NMN. *Id.* ¶ 51. And under the FDA's new interpretation, Niagen's competitors can now introduce NAD+ products that are based on NMN. *Id.* ¶ 16. The government moves to dismiss Niagen's claims, brought under the Administrative Procedure Act, arguing that Niagen has not shown Article III or prudential standing to assert the claims.

## II. Discussion

The court addresses the government's arguments that Niagen lacks Article III standing and prudential standing, in turn.

### A. Niagen's Has Article III Standing Based On Financial Harm From Increased Competition

To establish Article III standing, Niagen must first identify an "injury in fact" caused by the challenged action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Under the doctrine of competitor standing, "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (cleaned up). "Agency action may increase competition, for example, if it allows new entrants into a fixed regulated market." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023).

The parties dispute whether the court's analysis of Niagen's standing is limited to the well-pled allegations in its complaint or whether the court can consider other materials. Niagen says the former, and the government says the latter. The court agrees with the government: Because the government raises a factual challenge to Niagen's standing, disputing Niagen's financial injuries, it's proper for the court to consider outside materials. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (explaining that when a defendant challenges "the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming

the truth of the facts alleged by the plaintiff and disputed by the defendant”). In those circumstances, “the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.” *Id.*; *see also* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (4th ed. Apr. 2026) (“When a factual challenge is made, there is no presumption of truthfulness attached to the plaintiff's allegations, and the plaintiff bears the burden of proving the facts supporting subject matter jurisdiction by a preponderance of the evidence.”).[1]

But the court concludes Niagen has shown competitive injury on this record. Niagen has proffered evidence that it lost sales because of the FDA’s decision to regulate NMN as a dietary supplement. According to that evidence, in the three quarters prior to the FDA’s decision, Niagen experienced strong net sales growth of “approximately 36% year over year.” ECF No. 24-1 ¶ 6 (declaration of Niagen’s CFO). But in the two quarters following the FDA’s decision, that year-over-year net sales growth significantly slowed—to 16% in the fourth quarter of 2025 and just 3% in the first quarter of 2026. *Id.* ¶¶ 7–8. Meanwhile, NMN sales by Niagen’s competitors “skyrocketed.” *Id.* ¶ 9; *see id.* (Niagen’s CFO attesting that NMN sales in the approximately seven months after the FDA’s reversal “have exceeded $14 million”). Both Niagen’s CEO and CFO have attributed that slowdown in part to the FDA’s NMN designation. *See id.* ¶ 13 (Niagen CEO stating in a May 2026 earnings call that “we are seeing an increase in NMN sellers and NMN sales” that “is impacting our sales”); *id.* ¶ 12 (Niagen’s CFO concluding that “Niagen continues to face lost

[1] To the extent the government also challenges whether Niagen’s well-pled allegations show standing even if those allegations were true, that argument fails. Niagen plausibly alleges that the FDA’s decision permits competitors to market products containing NMN as dietary supplements, allowing them to “encourage consumers to purchase their products instead of Niagen’s lawfully marketed” alternatives and “divert some sales from Niagen.” ECF No. 1 ¶ 15; *see also id.* ¶¶ 7–8, 16, 93–94. That is a classic competitive injury. *See Air Excursions LLC*, 66 F.4th at 280.

sales because of FDA's action"). Consistent with those statements, the company disclosed in public filings the financial pressures it faced from the FDA's decision. *See, e.g.*, ECF No. 20-7 at 20 (Niagen's 2025 Form 10-K stating that "[i]f [the FDA's NMN] determination is not overturned or superseded, it may introduce additional channels of competition in certain product categories"); *id.* at 31 (similar). All told, Niagen estimates that it has lost "at least $15 million in revenues because of FDA's action." ECF No. 24-1 ¶ 11. Investors, it seems, also viewed the FDA's decision as harmful to Niagen's financial outlook: Prior to the FDA's decision, Niagen's stock closed at $9.90 per share, but the day after the FDA's decision, it fell to $7.89 per share, and then to $6.93 by the end of the week. *Id.* ¶ 14. The court finds that this evidence credibly shows the FDA's decision contributed, at least in part, to a change in Niagen's financial fortunes, causing it injury.[2]

Niagen's competitive injury is also consistent with "commonsense economic principles," which "can be useful when evaluating Article III standing": When new competitors enter a market, the existing market players will predictably find themselves facing sales headwinds in most cases. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025). Taken together, the evidence here, along with "commonsense inferences" about that evidence, suffice to show competitive injury. *Id.*; *see Sherley*, 610 F.3d at 72 (explaining that there is competitive injury when "increased competition" causes the plaintiff to "lose sales to rivals"); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970) (concluding that "future loss of profits" from competition amounts to an injury in fact).

---

[2] The government objects to reliance on stock price decline as evidence of injury. *See* ECF No. 26 at 8–9 (citing cases). But the point here is not that the drop in Niagen's stock price after the FDA's decision is itself the relevant injury. Rather, that drop is simply one piece of evidence, among many others, that the FDA's action was a contributing factor to other concrete injuries, like the slowdown in sales. The government does not appear to contest that its NMN decision soured investor expectations for Niagen.

The government asks the court to discredit Niagen's evidence about financial harm for two reasons. It first points to public statements by Niagen's CEO downplaying the impact of the FDA's decision. For example, in October 2025, he suggested the influx of new NAD+ products might benefit the company: "We believe the FDA's latest reversal . . . relating to NMN could serve to increase awareness of the NAD+ precursor market overall and the safety and efficacy of Niagen, in particular." Niagen Bioscience, Press Release (Oct. 6, 2025), https://perma.cc/2M9S-M37C; *see also* ECF No. 20-8 at 12 (Niagen's CEO stating on an earnings call that the influx of NAD+ product advertising in the wake of the FDA's reversal "only helps increase the market" and that "[w]e'd rather have 20% of $10 billion than 50% of $500 million"). And on an earnings call in November 2025, he said "[i]t's only been 5 or 6 weeks, and we haven't noticed anything yet. . . . [A]t this point in time, we're not seeing any meaningful impact from the change in that [FDA] rule." ECF No. 20-6 at 9–10. But the court finds that these statements, while perhaps reflecting a slow appreciation of or undue optimism about the impact of the FDA's reversal on the company's top line, do not show that financial harm did not, in fact, occur. Indeed, the evidence described above indicates that the effect of the FDA's decision on Niagen's business became clearer over the next two quarters, not overnight. *See* ECF No. 24-1 ¶ 13 (Niagen CEO explaining on Q1 2026 earnings call that the FDA's decision "is creating some headwinds for us that did not exist a few months ago").[3]

---

[3] As the government is right to point out, Niagen doesn't precisely specify when it estimates it began losing out on sales due to the FDA's decision. Niagen's estimate that there have been at least $14 million in sales of competitor NMN products covers a period both before and after the complaint's filing, as does its CEO's comment describing "headwinds" that "did not exist a few months ago." *See* ECF No. 24-1 ¶¶ 13, 19. That matters because standing is assessed at the time the complaint is filed—here, February 2026. *See Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012); ECF No. 1. But Niagen's burden is only to show that there was some concrete harm by the time of the complaint. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)

Next, the government says Niagen's asserted financial harm is undermined by earnings data showing continued sales growth after the FDA's decision. *See* ECF No. 20-1 at 17 (government's brief describing Niagen's "impressive sales growth"). But the evidence shows this growth turned sluggish after the FDA's decision, falling from 30% year-on-year net sales growth in the quarter before the decision to 16% and then just 3% in the two quarters that followed the decision. *See* ECF No. 24-1 ¶¶ 6–8. That Niagen's growth was positive in absolute terms does not mean the company experienced no lost sales from the FDA's NMN designation. And, although the government says Niagen did not identify the FDA's NMN designation as a reason for the slowdown in sales in its 2025 annual report, as described above, that does not necessarily discredit Niagen's evidence that financial harm ultimately occurred. Indeed, Niagen did warn in its annual report that the company "face[s] significant competition" and identified the FDA's NMN determination as a potential source of competition unless the FDA's decision is "overturned or superseded." ECF No. 20-7 at 20. Niagen identified that risk as early as a month after the FDA's decision. *See* Niagen Bioscience, Press Release (Nov. 4, 2025), https://perma.cc/8TWK-JB9K (Niagen press release regarding Q3 2025 earnings identifying "determinations made by the FDA and other governmental authorities, including with respect to products seeking to compete in our market," as a risk to the business).

("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). On this record, the court does not find a basis to conclude that all of the harm to Niagen sprang up in the weeks after the complaint was filed. The better inference from the evidence as a whole is that Niagen faced increasing sales pressure in the months after the FDA's decision, with at least some of the resulting lost sales occurring in the four-month period between the FDA's decision and the filing of this suit. So, the court finds that at least a small amount of Niagen's lost sales occurred prior to the time of filing.

On this record, the court finds Niagen has shown it experienced at least some financial harm from the FDA's decision to allow competitor products to enter its corner of the dietary-supplement market, and therefore has satisfied its burden to show Article III standing at this stage.[4]

**B. Niagen Has Prudential Standing As A Participant In The Dietary-Supplement Market**

The APA allows anyone "adversely affected or aggrieved by agency action" to get judicial review of that action. 5 U.S.C. § 702. Although, as described above, Niagen has shown injury in fact from the agency action it challenges, the Supreme Court has added a "gloss" to section 702, requiring a plaintiff to meet "the additional requirement that the interest sought to be protected by the complainant be arguably within the zone of interests to be protected or regulated by the statute" at issue. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395–96 (1987) (cleaned up). The Supreme Court has cautioned that this test, called the zone-of-interests test, "is not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation marks omitted). It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (quotation marks omitted). The "salient consideration" under the zone-of-interests test is "whether the challenger's interests are such that they in practice can be expected to police the interests that the statute protects." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022).

---

[4] The government does not dispute that, assuming Niagen experienced an injury in fact, its injury is "fairly traceable" to the FDA's reversal decision and would likely "be redressed by a favorable decision" here. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *see* ECF No. 20-1 at 8. Those standing requirements are met here, too. The competition posed by NMN-based products is traceable to the FDA's decision to allow those products into the market as dietary supplements and, for the same reason, vacating that agency action would redress the competitive injury.

The court rejects the government's argument that Niagen falls outside of the statute's zone of interest because Niagen's interests fall comfortably within the zone. *See Clarke*, 479 U.S. at 396. To start, "[p]arties regulated by a statute" plainly "fall within its 'zone of interest,'" and Niagen is one of those regulated parties. *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 704 (D.C. Cir. 1994). Niagen's claims relate to the proper scope of the statutory term "dietary supplement," and Niagen, a dietary-supplement maker, is directly regulated by that provision, which defines the contours of the market in which Niagen's products compete. 21 U.S.C. § 321(ff). So its interests are directly implicated here as a regulated party. Indeed, how the statute applies to NMN has directly shaped Niagen's regulatory obligations and its development of dietary supplements: Niagen says it "chose not to invest in NMN as a dietary supplement" because NMN was being investigated as a potential new drug by another biotech company, "leading Niagen to believe that NMN could not be lawfully sold as a dietary supplement." ECF No. 1 ¶ 53. On these allegations, Niagen's interests fall within the "zone of interests" that are "regulated by the statute." *Clarke*, 479 U.S. at 396.

In addition, the "zone of interests Congress intended to protect" reaches not only parties "whom Congress expressly or directly indicated were the intended beneficiaries of a statute" but also "parties whose interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests." *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989). While Niagen's direct concern may be shielding its dietary supplements from what it sees as unlawful competitor products rather than the safety of other manufacturers' products, its suit to enforce the boundary between drugs and dietary supplements coincides with consumers' interest in product safety. *See id.* One of the statute's clear goals is to ensure that products approved or being investigated as drugs are generally regulated as

drugs, subject to the safety strictures that designation entails, and not as dietary supplements. *See* 21 U.S.C. § 321(ff)(3)(B)(i)–(ii); *see generally id.* § 355. Niagen's interest concerns that same dividing line—that products it believes are properly classified as potential new drugs, like NMN, be classified that way, subject to all the product-safety regulations that designation entails, rather than being permitted to proceed to market without those restrictions. *See* ECF No. 1 ¶ 9 (alleging "FDA's new position further incentivizes rushed, unsafe, and unlawful marketing of dietary supplements"); *id.* ¶ 8 (alleging that permitting NMN to be marketed as a dietary supplement without a new dietary ingredient notification "undermines FDA's ability to ensure the safety of dietary supplements"); *id.* ¶ 93 (alleging the FDA's change in interpretation "opened the market to products illegally marketed (with questionable safety) as dietary supplements containing NMN that compete with Niagen's lawful dietary supplements."); *id.* ¶ 30 ("Premarket approval for drugs is a rigorous process, requiring clinical studies establishing that the drug is safe[.]"); *id.* ¶ 96 ("Allowing illegal and potentially unsafe dietary supplements to proliferate unchecked undermines public safety and has real consequences.").

The government argues otherwise by saying the statutory zone of interests should be defined not based on the statute's definition of "dietary supplement," but instead based on a sub-sub-section of that definition that excludes certain ingredients from being a "dietary supplement" if they are in drug development. *See* 21 U.S.C. § 321(ff)(3)(B). According to the government, it is therefore not enough to be a dietary-supplement company to be within the zone of interests; a plaintiff must be a company that is in drug development. That's too myopic. Courts "do not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship." *Indian River County v. U.S. Dep't of Transp.*, 945 F.3d 515, 530 (D.C. Cir. 2019) (cleaned up). While the statute defines both a

category ("dietary supplements") and exceptions, the boundary line between the category and its exceptions implicates both sides of the line. It would therefore be superficial to draw a line between the "interests" protected by what falls within the definition of dietary supplement and what falls within its exclusion for ingredients going through drug development. Indeed, the drug exclusion clause has its own further exception, so some products that would otherwise be treated as drugs under the drug exclusion clause nonetheless qualify as "dietary supplement[s]." *See* 21 U.S.C. § 321(ff)(3)(B) (defining a product as a dietary supplement even if it contains an ingredient that is approved or authorized for investigation as a drug so long as the product was "marketed as a dietary supplement" prior to that approval or authorization). The Supreme Court has made clear the zone-of-interests standard is "lenient" and "not especially demanding"—it does not call for the exacting approach that the government asks for here. *Lexmark*, 572 U.S. at 130 (quotation marks omitted).

The government also relies on legislative history of the Dietary Supplement Health and Education Act of 1994 to argue that Congress adopted the drug exclusion clause because it "wanted to avoid evasion of the drug approval process" through the drug exclusion clause, while also ensuring "that dietary supplements and food that were already on the market" prior to being investigated as drugs could "continue to be dietary supplements (or food)." ECF No. 20-1 at 20–21 (citing S. Rep. No. 103-410, at 20 (1994)). According to the government, because Niagen is neither a drug manufacturer nor a dietary-supplement manufacturer pushing for a product to be included in (as opposed to excluded from) the dietary-supplement market, its interests are different than those discussed in legislative history about the drug exclusion clause. But the full context of the legislative history shows a more general concern: ensuring that products are slotted into the most appropriate regulatory regime—"food" or "drug"—generally based on their "intended use." S. Rep. No. 103-410, at 20 (1994); *see also id.* ("If a vitamin product or an herbal product, for

example, is represented for use as a 'dietary supplement,' it is a food; if it is represented to cure, mitigate, treat, or prevent disease, it is a drug."); *cf.* S. Rep. No. 75-152, at 2 (1937) (recognizing the Federal Food, Drug, and Cosmetic Act, which the Dietary Supplement Health and Education Act of 1994 amended, "affects so many and such varied industrial interests in intricate and technical particulars"). With that purpose in mind, the interest of a drug manufacturer (which the government admits the statute protects) is not different in kind from that of a dietary-supplement manufacturer—both have an interest in proper classification. The government's argument that the zone of interests encompasses only a dietary-supplement manufacturer's claim to include, rather than exclude, a product from the dietary supplement definition is similarly unpersuasive: What matters is that Niagen's interests coincide with the ones that the statute protects, such that it "can be expected to police the interests that the statute protects"—exactly what Niagen seeks to do in this suit. *CSL Plasma Inc.*, 33 F.4th at 589.

**III. Conclusion**

For these reasons, the government's motion to dismiss, ECF No. 20, is denied.

AMIR H. ALI
United States District Judge

Date: November 19, 2026